Kevin K. Tung, Esq., Pro Se
KEVIN KERVENG TUNG, P.C.
Queens Crossing Business Center
136-20 38th Avenue, Suite 3D
Flushing, New York 11354
(718) 939-4633

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-----------------------------------------------------------x

KEVIN K. TUNG, ESQ. FOR HIMSELF
AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED,

                    Plaintiff,             Civil Action No.: 19-00871(FLW)(TJB)

      v.                                 CIVIL ACTION

STUART RABNER (intended to be the
Chief Justice of the Supreme Court of New
Jersey), GLENN A. GRANT, (intended to be
the Acting Administrative Director of the           **AMENDED COMPLAINT FOR**
New Jersey Courts), CARMEN MESSANO,         **DECLARATORY JUDGMENT**
(intended to be the Presiding Judge for
Administration for the Appellate Division of
the Superior Court of New Jersey), AND
JOHN DOE AND JANE DOE, THE
INDIVIDUALS WHO ARE APPOINTED
TO BE IN CHARGE OF THE MANAGING AND
SUPERVISING OF THE ADMINISTRATION
OF THE SUPERIOR COURT OF NEW
JERSEY AND WHO HAVE SIMILAR
OFFICIAL DUTIES OR CAPACITIES
AND WHOSE NAMES ARE UKNOWN
TO THE PLAINTIFF,

                    Defendants.

-----------------------------------------------------------x

        Plaintiff, Kevin K. Tung, for himself and on behalf of all attorneys similarly situated,

alleges on information and belief as follows:

## Nature of the Action

1.      This is an action for a declaratory judgment as to plaintiff's rights and for a preliminary and permeant injunction, pursuant to 28 U.S.C. §2201, seeking to declare and enjoin the defendants, Stuart Rabner, the Chief Justice of the Supreme Court of New Jersey, who also serves as the administrative head for the New Jersey Courts Systems, overseeing the management of the New Jersey State Courts Systems, Glenn A. Grant, the Acting Administrative Director of the New Jersey Courts, who is appointed by the Chief Justice to help the Chief Justice to fulfill the management duties of the courts systems for the State of New Jersey pursuant to the New Jersey Constitution of 1947, to implement pertinent due process procedures to protect non-party attorneys like plaintiff or attorneys similarly situated from judicial criticism which rises to the level of a public reprimand in the court proceedings, where the non-party attorneys are not a party and are not given opportunities to defend themselves, in an opinion or decision without first giving the non-party attorneys due process of law.

2.      This is also an action for a declaratory judgment as to plaintiff's rights and for a preliminary and permeant injunction, pursuant to 28 U.S.C. §2201, seeking to declare and enjoin the defendant, Carmen Messano, the Presiding Judge for Administration for the Appellate Division of the Superior Court of New Jersey, who is responsible for the overall administration of the Appellate Division of the Superior Court of New Jersey, to take corrective measures and remedies to ensure the due process rights and liberty interests of the plaintiff in the court proceedings in which plaintiff was not a party and was not given due process before unconstitutional decisions or opinions were rendered against plaintiff and the wrongs against the plaintiff by those unconstitutional decisions or opinions are still in the public domain, which continuously affect the

plaintiff's due process rights and liberty interests rights guaranteed by the United States Constitution.

3. If defendants, Stuart Rabner, Glenn A. Grant, and Carmen Messano are not the appropriate Judges, who have the official capacities to make the corrections demanded in this action, this action is then intended for a declaratory judgment, pursuant to 28 U.S.C. §2201, seeking to declare and enjoin John Doe and Jane Doe, the Individuals, who are appointed to be in charge of the managing and supervising the administration of the Superior Court of New Jersey and who have similar official duties or capacities to make the corrections demanded in this action and whose names are unknown to the plaintiff at this time.

4. Plaintiff, a non-party attorney, was the victim of the decision and opinion of the Appellate Division of the Superior Court of New Jersey dated July 21, 2016 (Exhibit "1") and the decision and opinion of Judge Barry A. Weisberg of the Superior Court New Jersey dated September 12, 2012 (Exhibit "2") in the matrimonial action Fou v. Fou, in which both courts rendered decisions and opinions with judicial criticisms, in the absence of participation in the proceedings, against plaintiff in the opinions or decisions which rises to the level of a public reprimand and which is a sanction, thereby due process must be given before rendering such an opinion or decision against plaintiff.

5. A declaratory judgment and injunctive relief are sought upon the grounds that the above mentioned decisions and opinions were the products of fraud upon the court and were in violation of the substantive and procedural due process guaranteed plaintiff, a non-party attorney to the underlying Fou v. Fou divorce action, by the Fourteenth Amendment to the Constitution of the United States and there has been full recognition of the due process right granted to plaintiff the ruling in the United States Court of Appeals for the Third Circuit in *Bowers v. NCAA*, 475 F.3d

3

524, 2007 U.S. App. LEXIS 2150. (3ʳᵈ Cir 2007) (The judicial criticism against an attorney in an opinion or order rising to the level of a public reprimand is a sanction, thereby due process must be given before rendering such an opinion.).

6.     The named defendants, who have the official capacities to administrate the New Jersey Courts systems, shall be enjoined to implement pertinent substantive and procedural due process procedures to safe guard the officers of the court, such as, the plaintiff from situations where plaintiff and attorneys similarly situated from being maliciously prosecuted by fraud upon the court in cases where plaintiff and attorneys similarly situated are not parties to the underlying actions and could not defend themselves. This type of forward-looking relief is permitted under *Ex Parte Young*.  See, *Am. Exp. Travel Reelated Servs. Co. v. Sidamon-Eristoff*, 755 F.Supp.2d 556, 568 (D.N.J. 2010), aff'd sub nom. *Am. Exp. Travel Reelated Servs. Co. v. Sidamon-Eristoff*, (3ʳᵈ Cir. 2012) ("it is long been established by the Supreme Court that the Eleventh Amendment does not preclude lawsuits against state officials in their official capacities to enjoin violation of federal law even where the remedy would enjoin enforcement and implement of an official state policy"). See, Opinion of Chief Judge Wolfson, dated November 26, 2019 in the instant case.

7.     Plaintiff was not given an opportunity to be heard and was not given an opportunity to defend himself in Fou v. Fou case before said both courts rendered decisions against plaintiff. The substantive and procedural due process procedure can be as simple as the court issues, *sua sponte*, an Order to Show Cause requiring the attorney to show cause in the court why the court should not issue an order for sanction against the attorney as most court systems would do before the sanction is imposed against the non-party attorney across the nation.

8.     A real and justiciable controversy exists between the parties concerning the impact on the plaintiff or attorneys similarly situated in the future for failure to implement pertinent

substantive and procedural due process procedures to safe guard the officers of the court, such as, the plaintiff or attorneys similarly situated in the future from being maliciously prosecuted by fraud upon the court where plaintiff or attorneys similarly situated are not a party to the action and are not given an opportunity to defend themselves.

9.      As a result of lacking of such a due process procedure in the Superior Court of New Jersey administrative system as evidenced that more than ten (10) judges in the Superior Court of New Jersey had handled the Fou v. Fou matters and yet none of them were alerted that the decisions and opinions rendered by the Courts against the non-party attorney were in violation of the non-party attorney's due process rights, plaintiff had suffered great harm in all subsequent proceedings against him.  Plaintiff does not wish to see the same wrongs being repeated in the future against himself and other attorneys similarly situated, because the society as a whole is bearing the cost of failure to implement said due process contemplated by the founding Fathers of this country.

10.     Defendants herein cannot assert absolute judicial immunity because the instant action is not suing the Judges or Justices for their individual culpability in adjudicative functions, but an action against the judges who are appointed and charged to manage and supervise the court administrative systems in their official duties and capacities for failure to implement pertinent substantive and procedural due process procedures to safe guard the officers of the court, such as, the plaintiff or attorneys similarly situated, from being maliciously prosecuted by fraud upon the court, where plaintiff or attorney similarly situated is not a party.  See, *Forrester v. White*, 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555, 1988 U.S.LEXIS 308 (1988), *Leclerc v. Webb*, 270 F.Supp.2d 779, 2003 U.S.Dist.LEXIS 12429 (Eastern District of Louisiana 2003).

11.     Plaintiff made motions to intervene in both the Appellate Division of the Superior Court of New Jersey and the Superior Court, Middlesex County in Fou v. Fou case attempting to

5

set aside the unlawful decisions or opinions against plaintiff. Both courts denied the access for plaintiff to intervene without legal analysis and explanations. The Supreme Court of New Jersey denied the petition for certification as well without any explanation. As of today, both of the above mentioned unconstitutional decisions or opinions are still in public domain and remain uncorrected, which are affecting the professional reputation of the plaintiff and in violation of the liberty interests of the plaintiff on a daily basis. Plaintiff has exhausted remedy in State Courts of New Jersey.

12.    Plaintiff's action is permitted under *Ex parte Young* exception as long as the named defendants in their official duties or capacities have some connection with the enforcement of the unconstitutional act. Even if entirely ministerial duties can be sufficient under *Young*, because the inquiry is not into the nature of an official's duties but into the effect of the official's performance of his duties on the plaintiff's rights. In the instant case, the above mentioned judges are appointed and charged to have the duties and capacities to ensure that the due process rights of the officer of the court like plaintiff or attorneys similarly situated are in place to protect the officer of the court. See, Opinion of Chief Judge Wolfson, dated November 26, 2019 in the instant case.

**Parties, Jurisdiction and Venue**

13.    Plaintiff Tung is a resident of the State of New York and is licensed to practice law in the State of New Jersey.

14.    Upon information and belief, defendant, Stuart Rabner, is the Chief Justice of the Supreme Court of New Jersey, who also serves as the administrative head for the court system, overseeing the management of the New Jersey State courts systems.

15.    Upon information and belief, defendant, Glenn A. Grant, is the Acting Administrative Director of the New Jersey Courts, who is appointed by the Chief Justice to help

the Chief Justice to fulfill the management duties of the courts systems for the State of New Jersey pursuant to the New Jersey Constitution of 1947.

16.     Upon information and belief, defendant, Carmen Messano, is the Presiding Judge for Administration for the Appellate Division of the Superior Court of New Jersey, who is responsible for the overall administration of the Appellate Division of the Superior Court of New Jersey.

17.     John Doe and Jane Doe are intended to be Individuals who are appointed to be in charge of the managing and supervising the administration of the Superior Court of New Jersey and who have similar official duties or capacities to make corrections and whose names are unknown to the Plaintiff.

18.     Jurisdiction of this Court is founded upon 28 U.S.C. §1331 in that this is a civil action arising under the laws and Constitution of the United States.

19.      Venue properly lies in this district pursuant to 28 U.S.C. §§1391(a), 1391(b) or under judicial decisions governing venue in actions within or both.

20.     The wrongful acts complained of occurred in the State of New Jersey and in this judicial district.  The forward looking relief sought herein is also in this jurisdiction.

## Background Statement of Fact

### Plaintiff Was Framed In the Proceedings In Which He Was Not A Party

21.     During February of 2009 through May of 2009, plaintiff took the representation of the client Mrs. Janet Yijuan Fou in a no fault uncontested divorce case under Docket No.: FM-12-1685-09E in the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County.

22.     Unknown to plaintiff at the time of representation, Mr. Fou and Mrs. Fou had worked out four (4) Chinese Agreements regarding their divisions of properties.  Other than asking

plaintiff to notarize one of the Chinese Agreements, Mr. Fou and Mrs. Fou agreed to the fact that the remaining three Chinese Agreements were never shown to plaintiff Tung. Plaintiff Tung prepared an English Property Settlement Agreement for the Fous during the representation without being given all the terms contained in the four (4) Chinese Agreements. The Fous peacefully performed the terms of the Chinese Agreements entered by and between themselves until 2011 after the completion of the uncontested divorce.

23.    In addition, unknown to plaintiff at the time of representation, Mrs. Fou intentionally withheld her critical financial information from plaintiff in preparation of her uncontested divorce documents, because Mrs. Fou was in the process of defrauding the government for Medicaid benefits even if she had just received $500,000 distributions in her devoice from the sales proceeds of their marital residence and other distributions from Mr. Fou. Mrs. Fou underreported her assets, including her business, and incomes on her applications for Medicaid. Mrs. Fou's fraud on Medicaid was caught later and she returned the funds she illegally received to avoid being prosecuted. (Exhibit "3")

24.    In 2011, Mrs. Janet Fou discovered that Mr. Fou returned from China with a new wife. Mrs. Fou decided to rescind all of the agreements that she entered with Mr. Fou. In July of 2011, Mrs. Fou contacted lawyers Willian Hu and James Plaisted for a possible malpractice case against plaintiff Tung on the ground that plaintiff Tung had failed to incorporate the terms of the Chinese Agreements into the English version of the Property Settlement Agreement, even though she knew this were not true. Attorneys Willian Hu and James Plaisted orchestrated a false malpractice action against plaintiff Tung. (Exhibit "4") In 2011, in order to set a ground for the malpractice case against plaintiff Tung here, Mrs. Fou retained attorney James Plaisted, Esq. to set

aside the English Property Settlement Agreement prepared by the plaintiff Tung here in the Superior Court of New Jersey, Middlesex County.

25.     In the email from William Hu to James Plaisted and Janet Fou dated July 27, 2011, (Exhibit "4") William Hu clearly discussed with James Plaisted with his plan to "drag Tung into the civil action with little cost by naming him as a co-defendant based on fraud so that we can use him as a conduit between us and Joe.  Whether Tung represents himself pro se or not, we can press him with discovery and show him the cards we have, which should be more than sufficient to bring the two down to their knees.  I hope Tung is adequately covered by professional malpractice insurance." In this email, Tung was falsely accused of knowingly omitting terms in the Chinese agreements when translating the Chinese agreements into English Agreement, which was a false fact fabricated by Mr. William Hu in order to build a false malpractice action against Tung.  Mr. Tung was also falsely accused of representing both Mrs. Fou and Mr. Fou with fabricated facts by Mr. William Hu, which Mr. Tung had shown above that even the expert paid by Mrs. Fou sided with Mr. Tung on this issue in accordance with clear evidence in the record.

26.     In the email from William Hu to James Plaisted and Peter Bracuti dated August 1, 2012, (Exhibit 32) this email shows the three attorneys conspiring to commit a crime against Mr. Tung by using him as conduit for the purposes of going after his law firms attorney malpractice insurance valued at $500,000.00 in the making prior to the Janet Fou v. Kevin Tung malpractice case.  William Hu was proposing to the two co-conspirators as how to share the illegal profits. (See, paragraph 3: If we settle, the minimum amount should not be less than 3 times the legal fee, e.g. $150,000 x 3 = $450,000. T.  The coded sentence is decoded below.

- [e.g. stands for "everyone gets"]

- [T. it's a code and it stands for "Tung."]

9

- [3 times the legal fee means the people who are in the email chain/everyone gets e.g. Hu, Plaisted and Bracuti]

27.    All three attorneys bragged about splitting the legal fees three ways. The three attorneys created and orchestrated the fraud against Mr. Tung by falsely using him as a conduit to hijack and steal malpractice insurance carrier $500,000.00 malpractice insurance.

28.    In the email from Janet Fou to James Plaisted and William Hu dated August 30, 2011, (Exhibit "31") this email shows that Janet Fou confirmed with William Hu and James Plaisted that Janet Fou already knew the family assets in after she read Joe Fou's Will in November 2007, two years prior to hiring Mr. Tung for the uncontested divorce in February 2009. Janet Fou kept the family financial information from Mr. Tung in 2009. In fact, he and his co-conspirators were successful to have the Court to believe their lies and granted their motion to set aside the English POA, which set for the stage for their subsequent false malpractice action. The jury should have been allowed to see this email under the crime and fraud exception to privileged communications.

29.    On or about September 28, 2011, Mrs. Fou filed a false certification prepared by her attorneys in support her motion to set aside the Property Settlement Agreement, in which she made material misrepresentations in various paragraphs that the plaintiff Tung here were shown all of the Chinese Agreements, but plaintiff Tung failed in incorporate the terms into the English agreement. (See, Paragraph 32 in Exhibit "5") Peter Bracuti, the associate of James Plaisted, in his response to Office of Ethics inquiry, stated that Janet Fou's false certification dated September 28, 2011 was prepared under the direction and supervision of Mr. Plaisted. (Exhibit "6")  In the false certification, the attorneys for Janet Fou never told the court that Mr. Tung was not shown or given all Chinese agreements.

30.    On or about November 17, 2011, attorney Willian Hu wrote to his co-counsels James Plaisted, Esq. and Peter Bracuti, Esq., informing them Mrs. Fou told William Hu that only one of the Chinese Agreements was shown to plaintiff Tung here. (Exhibit "7") Said document can be admitted into evidence because it fits into a "crime or fraud" exception to privilege. (the privilege shall not extend to a communication in the course of legal service sought or obtained in aid of commission of a crime or a fraud. N.J.S.A. 2A:844-20(2)(a)), Also See, *Fellerman v. Bradley*, 99 N.J. 493 (1984); 493 A.2d 1239, 1985 N.J. Lexis 2349.

31.    On or about May 11, 2012, during the deposition of Mrs. Janet Fou, she admitted that only one of the Chinese Agreements was shown to Plaintiff Tung here, her attorney James Plaisted, Esq. was the defending attorney for Mrs. Fou in the deposition.  Mrs. Fou gave the same testimony in her deposition on June10, 2014 also. James Plaisted, Esq. was the defending attorney for Mrs. Fou there. (Exhibit "8")

32.    On September 12, 2012, in the hearing for a post judgment motion to set aside Property Settlement Agreement, during cross examination of Mr. Fou, despite the fact that James Plaisted, Esq. knew that not all the Chinese Agreements were shown to Mr. Tung, James Plaisted, Esq. still confirmed with Mr. Joe Fou:  (Exhibit "2", Hearing Transcript page 51, Lines 17-25 and page 52, Lines 1-16)

Q: Mr. Fou, you agree that the English divorce and separation agreement makes no mention of company assets: does it?

A.    Correct.

Q: And you agree that you did not tell Mr. Tong about your separate agreement to divide all company assets and real property in China with Mrs. Fou; correct?

A.    I didn't, neither Janet.

Q: And in your – when he was sending you drafts of documents, did you ever write to him and say anything about the Chinese agreement to split all property in China and real estate in China, 50/50? Yes or no if you can.

A.      I didn't.

Q:  And you don't have any reason --

A.      Neither Janet.

Q:  You have no reason to believe he even knew that there was a Chinese company, Chinese assets and Chinese bank accounts; correct? And if you can answer correct or not, I would appreciate it.

A.      Who are you referring to him?

Q:  Mr. Tong.

A.      Mr. Tong had no knowledge about the company between us.

Mr. Plaisted: No other questions, Your Honor.

33.      Subsequently on the same day, during the hearing before Judge Barry A. Weisberg, James Plaisted, Esq. in his closing argument, knowing that Mr. Tung was never given all of the Chinese Agreements in prior proceedings, intentionally made a material misrepresentation to the Court.  He stated that "if one wanted to know and see a moment of truth and somebody who was deceived in terms of the agreements, I would submit the agreements themselves show it.  The Chinese agreements are executed the very day.  They go to Mr. Tong (Tung) and they contained these promises that she (Janet Fou) understood were binding.  And he (Mr. Tung) then controls the proceedings.  And I would ask Your Honor to make this right and upset agreement. (PSA)" (Exhibit "2": 9/12/2012, Hearing Transcript page 60, Lines 24-25 and page 61, Lines 1-7) This

material misrepresentation by Mr. Plaisted to Court is more than not being candor to Court but to a level of a fraud upon the Court.

34.    Clearly, in the hearing on September 12, 2012, Mr. Plaisted disregarded the fact that his co-counsel had informed him that not all of the Chinese Agreements were given to Mr. Tung. Mr. Plaisted disregarded the fact that his own client Mrs. Fou's testimony during deposition that not all Chinese Agreements were given to Mr. Tung. Mr. Plaisted even asked Mr. Fou during the hearing and Mr. Fou also informed him that not all Chinese Agreements were given to Mr. Tung. (See, pages 51-52, in Exhibit "2") For this undisputed fact between Mr. Fou and Mrs. Fou, Mr. Plaisted knew exactly the fact that not all of the Chinese Agreements were given or shown to Mr. Tung. Mr. Plaisted still misrepresented to the Court that all Chinese Agreements were given to Mr. Tung and Mr. Tung was in control of them, even though James Plaisted knew that the undisputed fact was Mr. Fou and Mrs. Fou both agreed that only one of the Chinese Agreements was shown to Mr. Tung. (Exhibit "2", Page 61, Lines 1-6)

35.    On September 2012, Judge Weisberg of Superior Court of New Jersey was successfully deceived by Mr. Plaisted and the decision rendered by Judge Weisberg was manifested with material misrepresentations made by Mr. Plaisted and Mr. Bracuti. The essential basis for the decision on the part of plaintiff Tung's representation of Mrs. Fou was that Mr. Tung failed to incorporate all the terms in the Chinese Agreements into the English Property Settlement Agreement prepared by Mr. Tung. Judge Weisberg condemned Mr. Tung in his decision that failure to incorporate Chinese Agreements into English PSA "was a knowing concealment of a relevant fact," which "rises to the level of a fraud upon the Court". This decision triggered the malpractice action against Mr. Tung. (Exhibit "2", Pages 67-71)

36.    Attorney James Plaisted's material misrepresentation in open court was just a portion of the misrepresentations that he knew were not true, when he made the misrepresentation to the Court to set aside the Property Settlement Agreement. Mr. Plaisted's material misrepresentation was actually in conjunction with the Certification of Janet Yijuan Fou dated September 28, 2011 made in support of her motion to set aside the Property Settlement Agreement. Upon information and belief, Peter Bracuti, Esq. was the attorney who prepared this false certification of Janet Yijuan Fou. (Exhibit "5")

37.    On September 30, 2011, said certification was filed with the Court.  In numerous sections, the certification tried to make the Court to believe that the Chinese Agreements were not incorporated into the English Agreement prepared by Mr. Tung, but without informing the Court that Mr. Tung was not shown or given all of the Chinese Agreements.  (See, paragraph 7 and 22 in Exhibit "5")

38.    Specifically, in paragraph 22, Janet Fou falsely stated that "[t]his English Agreement did not reference any of the prior 'Chinese' agreements executed between myself and the Defendant and by signing this English Agreement, it was never my intention to waive any of the various entitlements afforded to me pursuant to our agreements written in Chinese and two of which were executed virtually simultaneously with the English Agreement."  If Mr. Tung was not advised the existence of the various Chinese Agreements, how could he make reference to the Chinese Agreements.  Mr. Tung was not a party in the hearing to voice his side of the story.

39.    Again, in paragraph 26, Mrs. Fou stated that "[t]he English Agreement which was presented and filed with the Court was materially false and omitted material particulars of the Chinese Divorce Agreements, two of which were executed virtually contemporaneously with the English Agreement."  Clearly, this was a material misrepresentation as we all know now, who

omitted material particulars of the Chinese Agreements?  Mr. Tung?  The Court was not advised that Mr. Tung was not shown all of the Chinese Agreements.  Again, Mr. Tung was not a party in the hearing to voice his side of the story.

40.    In paragraph 32, Janet Fou finally pointed her figures at Mr. Tung.  "[W]hen I inquired of the Defendant (Mr. Fou) as to when he would begin to honor the Chinese Agreements which we had signed, most specifically the Agreement to provide an accounting as to the family company and transfer my ½ interest therein.  At that time, Defendant indicated that he would not do so because the critical terms of the Chinese Agreements were omitted from the divorce decree and/or the English Agreement provided to the Court for incorporation into our Final Judgment of Divorce.  <u>It was based upon these statements that I began to question the appropriateness of Mr. Tung's representation of me and Defendant's role in orchestrating my execution of an English Agreement, which failed to mention our previous executed agreements.</u>"  Obviously, this was a material misrepresentation to Court, Mrs. Fou knew that Mr. Tung was not provided with all the Chinese Agreements, when English Agreement was prepared by Mr. Tung.

41.    In addition, Janet Yijuan Fou made a false representation to Court that I represented both parties in Fou v. Fou, (See, paragraphs 16, 17, 18 in Exhibit "5") Said representations were not true and directly against her own testimony in the open Court. (See, Exhibit "D" attached to Exhibit "5": Transcript of 5/4/2009, Pages 4, Lines 21-25, and Page 25, Lines 1-9) She specifically told the Court that her husband had a right to a lawyer, but he said he did not need it.  This was her state of mind then that Mr. Tung was not representing her husband.  Mrs. Fou had signed the Confidential Litigation Information Sheet, which indicated I was her attorney only. (Exhibit "20") All of the documents submitted to Court indicated that Mr. Joe Zhouwu Fou was a pro se defendant and I only represented Mrs. Fou as the plaintiff's attorney. (Exhibit "20")

42.    With reference to the misrepresentation that Mr. Tung virtually had no communications with Mrs. Fou during the representation, Janet Fou could have conversations with Mr. Tung to ask questions for at least four times on 2/15/2009, 2/27/2009, 4/18/2009, and 5/4/2009 before the judgment of divorce was entered. (Exhibit "21") At least two of dates were not in the presence of Mr. Fou. She admitted during the malpractice trial and deposition.  In fact there was nothing to prevent her from contacting plaintiff Tung here for any concerns she might have. All of those misrepresentations made were for a sole purpose to have a ground to set aside the Property Settlement Agreement and later to start a fraudulent legal malpractice against Mr. Tung.  Judge Barry A. Weisberg was clearly misled by those misrepresentations when decided the motion to set aside the Property Settlement Agreement in the absence of plaintiff Tung's participation in the proceeding.

43.    Mrs. Fou and her attorneys James Plaisted and Peter Bracuti's material misrepresentations to Court were not something that can be excused or immaterial.  The fact that Judge Barry A. Weisberg made his decision to set aside the Property Settlement Agreement was mainly based on the false facts mispresented to him during the hearing and on the motion papers.  Both Mr. Plaisted and Mr. Bracuti's material misrepresentations had a major impact on Judge Barry A. Weisberg's decision.

44.    On September 12, 2012, Judge Barry A. Weisberg rendered the decision.  Some of the reasoning related to the impression Judge Weisberg had on the misrepresentations by Mr. Plaisted and Mr. Bracuti to the Court are cited as follows:

45.    "Now what we have in this case are really not one agreement, but a series of agreements.  Again, only one of which was presented to the Court at the time of the divorce, which is very troubling.  Because there are some inconsistencies between the agreements.  The agreement

that -- agreements that were in Chinese, quite frankly, were the ones I would expect Mrs. Fou to understand better than anything else because that's her native language." (Exhibit "2": 9/12/2012, Hearing Transcript page 67, Lines 23-25 and page 68, Lines 1-6)

46.    Judge Barry A. Weisberg had so much concerns why only 12 days after the Chinese Agreements were signed, the English Property Settlement Agreement was so much different from the Chinese Agreements. (See Exhibit "2": 9/12/2012, Hearing Transcript page 68, Lines 15-17) "Now only 12 days later they come to court—or only in May, but only 12 days later, they come— they sign an agreement, which by their own agreement doesn't even mention the company." (Exhibit "2": 9/12/2012, Hearing Transcript page 69, Lines 6-9)

47.    "In addition, the existence of the Chinese agreements will do nothing more or less than lull Mrs. Fou into a false sense of confidence as to what she had agreed to, or what was in her Judgment of Divorce, or the import of that document." (Exhibit "2": 9/12/2012, Hearing Transcript page 70, Lines 13-17)

48.    "Also these agreements, I don't know if they're superseding agreements, if they're read – intended to be read together.  Certainly the Chinese agreements are not consistent, taken as a whole, with the English agreement.  And I think the English agreement, quite frankly in the way it was presented to the Court, unfortunately rises to the level of a fraud upon the Court." (Exhibit "2": 9/12/2012, Hearing Transcript page 70, Lines 24-25 and page 71, Lines 1-7)

49.    "Certainly no judge reading that agreement would have any way of knowing that the separate Chinese agreements exist.  At the very least, it was a knowing concealment of a relevant fact." (Exhibit "2": 9/12/2012, Hearing Transcript page 71, Lines 8-11)

50.    Needless to say, Judge Barry A. Weisberg's decision was entirely based on the misrepresentations which Mr. Plaisted and Mr. Bracuti had made to the Court that Mr. Tung was

given or shown all of the Chinese Agreements and Mr. Tung intentionally concealed the fact to the Court that there were four Chinese Agreements with the terms that Mrs. Fou understood and was promised. But Mr. Tung intentionally failed to incorporate them into the English Property Settlement Agreement. As a result of the misrepresentations, the Judge Barry A. Weisberg reached a wrong conclusion in the absence of Mr. Tung's presence to void his side of the story.

51.    "And I don't find that Mrs. Fou was – even if that was her burden, was sophisticated or savvy enough to bring that to the Court's attention. I find that she was being manipulated through this divorce process." (Exhibit "2": 9/12/2012, Hearing Transcript page 71, Lines 11-15) Obviously, Judge Weisberg was never advised by Mr. Plaisted that Mrs. Fou knew the existences of all four Chinese Agreements and she acknowledged that at least three of the four Chinese Agreements were never shown or given to Mr. Tung. Mrs. Fou participated and agreed with Mr. Fou not to show those Chinese Agreements to Mr. Tung. Having been made aware of the truth of the case, or at least that Mrs. Fou's testimony that Mr. Tung was not made aware of the existence of all of the Chinese Agreements, which were essentially Mr. Fou's testimony at the hearing, the Court may not have a ground to set aside the Property Settlement Agreement. Mr. Plaisted knew that Mr. Fou's testimony was true at the time of the hearing. If Mr. Plaisted also informed the Court that Mrs. Fou had told the same true fact that Mr. Tung was not shown with all of the Chinese Agreements, then the Court may not have a reason to set aside the Property Settlement Agreement prepared by Mr. Tung. Clearly, Mr. Plaisted violated New Jersey RPC 3.3 that a lawyer shall not fail to disclose to the tribunal a material fact with knowledge that the tribunal may tend to be misled by such failure.

52.    New Jersey RPC 3.3 mandates that a lawyer shall not knowingly make a false statement of material fact to a tribunal. A lawyer shall not fail to disclose a material fact to a

tribunal when disclosure is necessary to avoid assisting an illegal, criminal or fraudulent act by the client. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures. A lawyer shall not fail to disclose to the tribunal a material fact with knowledge that the tribunal may tend to be misled by such failure.

53.    If Mr. Plaisted and Mr. Bracuti did follow NJRPC 3.3, one thing will be for sure is that the Court would not have a reason to make those false statements regarding Mr. Tung's representation of Mrs. Fou during his representation in Fou v. Fou case. There would be no ground for Mrs. Fou to commence the malpractice action against Mr. Tung.

54.    The Appellate Division decision argued on June 8, 2016 essentially repeated and adopted the reasoning of Judge Weisberg on Mr. Tung's representation of Mrs. Fou, which is essentially based on the major misrepresentations made by James Plaisted, Esq. and Peter Bracuti, Esq. that all of Chinese Agreements were shown to Mr. Tung. Again, Mr. Tung was not a party to the appellate proceeding in the Fou v. Fou's matter. Mr. Tung was not permitted to file his brief or argue before the Appellate Court. Mr. Tung was not notified the proceeding of the appeal and was afforded an opportunity to argue to defend himself in the Appellate proceeding. The Appellate Division also overlooked that Mr. Tung was not a party to the Fou v. Fou matrimonial case. The followings cited some of the languages in the Appellate Division decision.

55.    "Plaintiff claimed that the PSA differed substantially from the parties' prior Chinese Agreements." (See, Exhibit "1", page 3) "[T]he court found that plaintiff had been manipulated in the divorce proceedings, and it was 'very troubling' that there were inconsistences between the PSA and the Chinese Agreements. The court noted that the PSA, which was executed only twelve days after the Chinese Agreements of February 15, 2009, did not mention a division of the company assets. " (See, Exhibit "1", page 5)

56.    The Appellate Division also noted "that plaintiff's counsel had indicated he was representing her in the proceeding, but the attorney had been "procured" by defendant, not plaintiff.  The attorney also had admitted that defendant had been the "conduit" for all information provided to him in the matter.  The attorney said he had prepared the PSA in accordance with defendant's instructions.  The court found that the retainer agreement was invalid, and that plaintiff had not been provided independent counsel.  (See, Exhibit "1", pages 4-5)

57.    "The judge noted that plaintiff did not initially know that significant terms of the Chinese Agreements had been omitted from the PSA." (See, Exhibit "1", page 9-10)  "The judge noted that plaintiff had difficulty understanding the English language and did not comprehend the differences between the Chinese Agreements and the PSA which was incorporated into the judgment." (See, Exhibit "1", page 11)

58.    "[T]he court pointed out the critical differences between the Chinese Agreements and the PSA, which showed that defendant had deceived and manipulated the divorce proceedings to plaintiff's disadvantage." (See, Exhibit "1", page 11)

59.    The record shows at no time upon learning that the false information was presented to Court, Mr. Plaisted and his associates had never made any effort to inform the Court that material misleading information was made to the court.  In addition, the record shows that Mr. Plaisted never in his any of responses denied any of the above allegations against him contained in the record. (Exhibit "9")  Rather, Mr. Plaisted admitted that the representation he made to the court was wrong, when he was interviewed by the investigator from Office of Attorney Ethics.  He stated "they is a misstatement, I guess" to the investigator from Office of Attorney Ethics.  Mr. Plaisted then said that "he should have said that Mr. Tung notarized the important Chinese

agreement and he should have said that it was given to Mr. Tung and he kept it to draft" the English agreement.

60.     The standard for determination of fraud upon the court is clear and convincing standard, not beyond reasonable doubt.  See, *Triffin v. Automatic Data Processing, Inc.*, 411 N.J.Super. 292, 986 A.2d 8, 2010 N.J.Super.LEXIS 3.  Also see, *Baxter v. Bressman*, 874 F.3d 142, 2017 U.S.App. LEXIS 20340 (A court may set aside a judgment based upon its finding of fraud on the court when an officer of the court has engaged in egregious misconduct.  Such a finding must be supported by clear, unequivocal and convincing evidence of (1) an intentional fraud; (2) by an officer of the court; and (3) which is directed at the court itself.  In addition, fraud on the court may be found only where the misconduct at issue has successfully deceived the court.) Therefore, this Court shall find that Mr. Plaisted had committed a fraud upon the court by clear and convincing evidence.

61.     In addition, said decisions were rendered against plaintiff Tung here in the absence of plaintiff Tung, a non-party to the Fou v. Fou proceeding in the Superior Court of New Jersey and who was never given an opportunity to present his defense, which is in violation of the substantive and procedural due process guaranteed plaintiff by the Fourteenth Amendment to the Constitution of the United States and there has been full recognition of the due process right granted to the plaintiff Tung by the ruling in the United States Court of Appeals for the Third Circuit in *Bowers v. NCAA*, 475 F.3d 524, 2007 U.S. App. LEXIS 2150. (The judicial criticism against an attorney in an opinion or order rising to the level of a public reprimand is a sanction, thereby due process must be given before rendering such an opinion.)

62.     The Fou v. Fou's trial court's findings on plaintiff Tung's alleged unethical representation were contained in the trail court's decision dated September 12, 2012.  (Exhibit "2")

21

A careful analysis of the court's decision by Judge Barry A. Weisberg will reveal that this decision was a product of fraud committed by the attorneys for Mrs. Fou upon the court. One of the major reasons for this fraud to take place is that Judge Barry A. Weisberg overlooked the fact that the allegations or findings against Mr. Tung was determined in the absence of Mr. Tung in the proceeding to defend the allegations against him that would eventually damage his professional reputation, good name, honor, or integrity, which is clearly a violation of his procedural due process right.

63.     Even though plaintiff was subpoenaed to testify as a fact witness by Mrs. Fou's attorneys and Mr. Fou, plaintiff Tung was not allowed to sit in the entire hearing, because plaintiff Tung was a fact witness. Plaintiff Tung was not allowed to call witnesses on his behalf. Plaintiff Tung was only allowed to answer the questions in the fashion posted by Mrs. Fou's attorney. Plaintiff Tung could not cross examine himself. Plaintiff Tung never argued a single legal issue before Judge Weisberg in the hearing. In fact, much of the facts pertinent to the allegations were unknown to plaintiff Tung at the time when plaintiff Tung was called to testify as a witness at the hearing. No question was asked if plaintiff Tung had been aware of the existence all of the Chinese Agreements. Plaintiff Tung did not even know the existence of the Chinese Agreements until through the discovery in the malpractice action against plaintiff Tung. As the Court in *Stevens v. Horton*, 984 P.2d 868, 161 Or.App. 454 (1998) pointed out that being called as a fact witness was not an equivalent of being represented adequately in a proceeding to defend oneself.

**Plaintiff Tung Could Have Presented His Defense If Given An Opportunity to Be Heard**

64.     Regarding one of the Chinese Agreements, Mrs. Fou insists that plaintiff Tung was given a copy of the notarized copy of the Chinese Agreement and plaintiff Tung failed to incorporate one of the provisions in the Chinese Agreement that "the real property and company

assets are to be accounted for separately" into the English Property Settlement Agreement plaintiff Tung prepared for them.  Mr. Tung's recollection is that Mr. Tung was only asked to perform a notary public service for the said Chinese Agreement and Mr. Tung told the Fous specifically that the only binding Property Settlement Agreement was going to be the one Mr. Tung was going to prepare for them.  Although this is a disputed issue that has nothing to do with the determination of this case for a declaratory judgment, reading though the following facts, however, will give the Court an overview or better understanding of the disputed issue here.

65.    Mr. Tung did not have the motivation not to include the provision if Mrs. Fou asked Mr. Tung to include the company assets division provision in the English Property Settlement Agreement.  Plaintiff Tung's legal fees was set at a fixed fee of $1,000, which includes the $275 court filing fees.  Plaintiff Tung charged this $1,000 because Mr. Fou told Mr. Tung that they did not have much funds and they came to the United States from the same city of Shanghai where plaintiff Tung came from in China.  Plaintiff Tung felt that plaintiff Tung was obligated to help them. It is a common practice that the parties share legal fees in uncontested divorce matter.  There was no misunderstanding that plaintiff Tung was going to represent Mrs. Fou for an uncontested divorce matter.  Mrs. Fou admitted during deposition that the Fous came to Mr. Tung's office for a divorce agreement just like in China.  She also admitted that the Fous found Mr. Tung to do an uncontested divorce in the affidavit prepared by her attorneys and during the trial for the malpractice action.  She testified in her deposition that the Fous paid a minimum to file a uncontested divorce for them. Her understanding of "uncontested" is what they wanted – they won't fight each other in open court." (Exhibit "21")  She now doubts plaintiff Tung's loyalty to her in the representation of her uncontested divorce.  She cannot just simply denounce that every document she signed she did not know.  After all of the seven years of discovery in the malpractice

case and two years of the investigation by the Office of Attorney Ethics, to plaintiff's Tung's knowledge, no one has found any evidence that plaintiff Tung secretly colluded with Mr. Fou in the uncontested divorce action.

66.     On the other side, Mrs. Fou had the motivation to hide the information from me, because she was about to falsely apply Medicaid even if she had just received over $500,000 distributions from the marital assets.  Mrs. Fou intentionally not to list her company assets in the Medicaid application at the same time when she had the uncontested divorce.  During the period from 06/01/2009 to 12/31/2011, Mrs. Fou "incorrectly" received Medicaid that must be repaid. (A copy of the Settlement Agreement with Medicaid Bureau of Fraud Investigation and application for Medicaid are annexed herewith as Exhibit "3") She also testified that she and Mr. Fou hid the Supplemental Chinese Divorce Agreement, the company assets division agreement (A copy is attached to Exhibit "5" as Exhibit "C") from the attorney (Mr. Tung) Page 103, lines 12-15, Janet Fou's deposition (Exhibit "22").

67.     Plaintiff Tung here has to bring to the court's attention that in the decisions or opinions of the Appellate Division and Judge Weisberg, the Courts were deceived by the plaintiff Mrs. Fou that Mrs. Fou worked in this country in various low-skilled jobs and she has limited English-Language skills.  (Exhibit "1" and Exhibit "2")  The Courts were not known at the time those decisions were rendered that when Mrs. Fou intentionally and willfully filled out the Medicaid application at the time plaintiff Tung was representing her for an uncontested divorce, the language barrier was never an issue for Mrs. Fou to fill out the forms with false income and assets.  She knew exactly what the right amount of false income she should use to receive the Medicaid and she knew where exactly on the forms to fill those false information.  (Exhibit "3") At that time, she just received over $500,000 at that time from her marital property distribution. In

order to avoid being prosecuted, Mrs. Fou agreed to return to the government what she had fraudulently obtained Medicaid benefits. (Exhibit "3")

68.    When she commenced a fraudulent malpractice proceeding against plaintiff Tung here, all of a sudden, her language skill became an issue.  She claimed that she did not understand any documents she signed.  She intentionally withheld the Chinese Agreements from plaintiff Tung here and later she sues plaintiff Tung here for failure to incorporate the terms into the English PSA she never informed plaintiff Tung.  With a history to commit fraud upon government and to intentionally withhold critical information from her attorneys in order to commence a false malpractice action for insurance fraud, and to provide false information to court, someone has to stand up and say to Mrs. Fou that you cannot do this in this country.

69.    If Mrs. Fou really wanted to have the company assets division included in the English version of the property settlement agreement as she testified that she had so much concern of it, (Exhibit "22", page 101, lines 9-25, page 102, lines 1-6) she would have at least two chances to catch the alleged omissions by plaintiff's office, while plaintiff Tung spent at least one hour to review the entire set of the uncontested divorce documents with her in my office on February 27, 2009.  One of the chance is at the time plaintiff Tung reviewed the English property settlement agreement with her when plaintiff Tung went over the entire uncontested divorce documents set on February 27, 2009.  The other chance is at the time when plaintiff Tung here reviewed the Case Information Statement with her on the same day.  (Exhibit "23", Mrs. Fou's own testimony to confirm the time)  Unlike she stated in her malpractice action complaint that plaintiff Tung here rushed to have Mrs. Fou to sign documents, there were only three or four signatures to sign, which did not take more than one hour to sign the documents.

70.     Plaintiff Tung went over each paragraph in the entire English Property Settlement Agreement (Exhibit "24") with Mrs. Fou.  She never asked plaintiff Tung here where her business assets division was addressed.  Plaintiff Tung went over the Case Information Statement with Mrs. Fou. (Exhibit "25")  She never asked plaintiff Tung here where her business assets information were listed.  Plaintiff Tung also explained to her paragraph 15 in the English Property Settlement Agreement.  (Paragraph 15 in the Exhibit "24") that in an uncontested divorce, she would waive her right to do discovery.  She did not ask plaintiff Tung to do discovery, nor did she inform plaintiff Tung any of the assets she knew in existence long before meeting plaintiff Tung.  Plaintiff Tung did even discuss small items such as, motor vehicles to be listed in the Case Information Statement.  It was impossible that plaintiff Tung and his staff omitted such a large item of company assets to be listed in the Case Information Statement unless Mrs. Fou never intended to let plaintiff and his staff know.

71.     Mrs. Fou also admitted during deposition that Mr. Tung did not give comments on the terms of the said Chinese Agreement that she claimed to have a copy given to plaintiff Tung and plaintiff did not give his opinion, because plaintiff Tung here was not asked to review the said Chinese Agreement but was only asked to notarize a document for them. (Exhibit "26")  Mrs. Fou could not fully explain why the Supplemental Chinese Divorce Agreement, which was supposed to supplement the Chinese Agreement that she claimed to have a copy given to Mr. Tung regarding their company assets division, was not given to Mr. Tung. (Exhibit "22")  The only reason she testified was that the Fous did not want the attorney to review because it contained "a lot of dollar amount." (Page 103, lines 12-15, Janet Fou's deposition (Exhibit "22").  This fact alone would show how conflict her testimony was.  On one side, she had so much concern that the Chinses Agreement shown to Mr. Tung was too simple on the company assets division so that she wanted

to have the Supplemental Chinese Divorce Agreement to elaborate the company assets divisions. But she intentionally withheld the said Supplemental Chinese Divorce Agreement from her attorney Mr. Tung.  She now blames Mr. Tung for failure to incorporate the terms of the Chinese Agreement into the English Property Settlement Agreement.  In fact, Mrs. Fou was doing exactly what she intentionally did in her Medicaid application to omit the company assets in the divorce proceeding.

72.    In addition, Mrs. Fou knew exactly what she was doing at the time of her divorce. The Fous performed their obligations in accordance with their Chinese Agreements.  Mrs. Fou even prepared a receipt for the funds she received from Mr. Fou for the year of 2009.  (Exhibit "27").  Mrs. Fou did not have a problem after the issuance of the divorce judgment with Mr. Fou until December of 2011, when Mrs. Fou discovered that Mr. Fou had found a new young wife. She told Mr. Fou in 2009 that "[h]aving a third people involved in, it will influence your new family when we discuss money issues.  I may not be calm." (Exhibit "28", 12/9/2009 email from Mrs. Fou to Mr. Fou)

73.    Once she discovered that Mr. Fou had a new wife, Mrs. Fou demanded to buy out her company shares. She even indicated in her email that "I (Mrs. Fou) let you (Mr. Fou) go and agree with no-fault divorce, so that you can keep more money, and have freedom and ability to find the dog-like obedient woman."  (Exhibit "29", 1/27/2010 email from Mrs. Fou to Mr. Fou)

74.    In another post-divorce judgment email to Mr. Fou, Mrs. Fou wrote, "For steady, the company will not be apart temporarily, it's good for us", which is your request when we broke up.  I agreed it by considering the overall situation.  In fact, I know, it is risky for me.  The risk is that you operate it by yourself, and you may transfer money to China, so the company could be shuttled down anytime. Due to anxiety about the risk, I list several companies' balance of 2007 on

supplemental agreement in particular." (Exhibit "30", 2/17/2010 email from Mrs. Fou to Mr. Fou) Yet, Mrs. Fou intentionally withheld that Supplemental Chinese Divorce Agreement from Mr. Tung at the time to prepare the English Property Settlement Agreement.

75.    In addition, Mrs. Fou in her 2/17/2010 email wrote that she was relying on Mr. Fou's integrity after the divorce for her interest.  (Exhibit "30")  On August 30, 2011, she wrote to her attorney for malpractice to tell him about the secrete will and other assets she had become aware of in November 2007, long before she came to Mr. Tung for the uncontested divorce. (Exhibit "31", email form Janet Fou to James Plaisted, admissible under fraud exception to attorney client privilege)  Yet, she said nothing about those assets to Mr. Tung and now she blames for Mr. Tung for failure to conduct discovery.  Clearly, she knew exactly what she was doing, and what risks she was willing to take, when she entered into the English Property Settlement Agreement.  Most of the allegations in her malpractice complaint against plaintiff Tung were lies. Being her attorney for her uncontested divorce matter, plaintiff Tung was the person becoming her target when she now has to find a person to blame for.  Unfortunately, plaintiff Tung was the person Mrs. Fou could find and plaintiff Tung was caught in the middle of Mrs. Fou and Mr. Fou's divorce battle and became the scapegoat, when Mrs. Fou could not collect her judgment from Mr. Fou.  Instead, she started a false malpractice action to commit another insurance fraud.

76.    When the trial court in Fou v. Fou action determined that the Fous' marital assets were $2.2 Million Dollars, no one had questioned why in any given year or years, the Fous never reported their company incomes and personal incomes that could possibly lead to the accumulations of $2.2 Million Dollars assets.  For Mrs. Fou to claim their marital assets in the amount of $2.2 Million Dollars as an admission, Mrs. Fou must have committed under-reporting

income taxes for their company or on their personal income tax returns. Mrs, Fou should have been equitably estopped from claiming that she had $2.2 Million Dollars.

77.     When the attorney for Mrs. Fou, James Plaisted, in the malpractice action asks for $1.5 Million Dollars legal fees, three times of the damages awarded the plaintiff to be awarded to him, Mr. Plaisted demonstrated to the Court that for greediness an attorney will do anything to obtain illegal profits that he does not deserve. Public policy mandates that making misrepresentations to the court by an officer of the court shall be prohibited and punished.

**Fruit of the Poisonous Tree Doctrine on Judge Weisberg's Decision**

78.     On or about October 13, 2013, plaintiff Tung made a motion for summary judgment in the case Janet Fou v. Kevin Tung, Esq. in the Superior Court of New Jersey. The motion was assigned to Judge Weisberg, the same judge who sat in the hearing to set aside the Property Settlement Agreement prepared by plaintiff Tung here. He would be the judge who had the best knowledge about the case. Surprisingly, Judge Weisberg requested that he be recused. (Exhibit "10") This was the first time, Judge Weisberg heard plaintiff Tung's side of the story.

79.     Exhibit "12" shows that Mr. Bracuti used Judge's Weisberg's decision in the plaintiff's opposition to motion for Summary Judgment by Mr. Tung. Exhibit "13" shows the reliance by the Court on determining the motion for Summary Judgment by Mr. Tung in the malpractice case. The Court stated that Judge Weisberg's decision should be "something that a jury could take note of? Wouldn't that be evidentiary?" (See page 13, lines 3-18, Exhibit "13")

80.     The problematic issues are whatever the determinations made by Judge Weisberg in the hearing on Mrs. Fou's motion to set aside the Property Settlement Agreement concerning Mr. Tung's alleged unethical representation in Mrs. Fou's uncontested matrimonial case was in the absence of Mr. Tung's participation to defend himself. Plaintiff Tung was not notified with

29

Judge Weisberg's decision until the malpractice action was filed against me.  Even if plaintiff Tung was notified, he could not appeal Judge Weisberg's decision, because he did not have the standing to appeal as a non-party fact witness.  However, plaintiff Tung had to defend the predetermined finding of facts contained in Judge Weisberg' decision in all subsequent proceedings against him when he was even not permitted to defend himself when Judge Weisberg rendered such an unfair and unconstitutional decision against plaintiff Tung.  Clearly, plaintiff Tung's procedural and substantive due process rights were violated.

81.    On or about July 22, 2016, the Appellate Division of the Superior Court adopted Judge Weisberg's opinion and finding of facts and affirmed the Weisberg's decisions below.  In addition, Appellate Division referred Mr. Tung to Office of Attorney Ethics for Investigation of his wrongdoings in the representation of Mrs. Fou in the uncontested divorce.  Said proceeding is still on going as of today. (Exhibit "1")

82.    On or about October 20, 2017, in a pre-trial conference in Fou v. Tung malpractice action against plaintiff Tung here, Judge Phillip Lewis Paley of the Superior Court of New Jersey ordered Mr. Tung to produce his personal income tax returns and his law firm business tax returns for the past four years after plaintiff Tung refused to settle the malpractice case against him.   Judge Paley indicated that he would be compelled to report to appropriate authorities an unlawful and/or unethical conduct by the party.  Mr. Tung complied with Judge's order to produce tax returns. (Exhibit "11")

83.    Plaintiff Tung felt very uncomfortable in the Fou v. Tung malpractice action against him after Judge Paley became a tax auditor and directed the production of tax returns before the trial.  He felt a bench trial before Judge Paley would not be impartial.  He requested a jury trial.  Said request was denied by Judge Paley at first.  After plaintiff Tung pointed out to the appropriate

court rules, which permitted plaintiff Tung be entitled to a jury trial. Judge Paley allowed plaintiff Tung to have a jury trial.

84.    On or about April 24, 2018, Judge Phillip Lewis Paley waved the redacted version of the decision of Judge Weisberg and told the jury that this is the decision which sets aside the Property Settlement Agreement prepared by Mr. Tung and the Appellate Division had affirmed the decision. The redacted version of the decision not only created confusions for the jury, but also caused prejudice to plaintiff Tung here, because Judge Paley's instruction was essentially instructing the jury that plaintiff Tung's conduct had been found deviated from the standard, which had been decided by another court already. The redacted version will even be more prejudice against plaintiff Tung here, because the jury would not see how judge Weisberg developed his conclusion. Nowadays jury can find a non-redacted version of the Judge Weisberg's decision on internet at their fingertips. (Exhibit "19")

85.    On or about April 25, 2018, the jury awarded Mrs. Fou $500,000 against plaintiff Tung for his malpractice in the Superior Court of New Jersey.

86.    On or about June 25, 2018, Judge Paley rendered a decision to deny plaintiff Tung's motion for judgment notwithstanding the verdict. In the decision, Judge Paley stated that "[t]he jury had every right to review the opinions rendered by Judge Weisberg (invalidating the financial aspects of the original divorce judgment) and the Appellate Division (affirming the material award made by Judge Rafano and reflected in the amended judgment of divorce), which were redacted to exclude any characterization of Mr. Tung's conduct made by the court. (See, pages 4-5, Exhibit "14")

87.    On or about November 30, 2018, the Appellate Division of Superior Court of New Jersey denied plaintiff Tung's motion to intervene in Fou v. Fou action for the purpose to set aside

the opinion rendered by Appellate Division dated July 22, 2016, which upheld Judge Weisberg's decision. (Exhibit "15")

88.    On or about December 18, 2018, the Superior Court of New Jersey, Middlesex County denied plaintiff Tung's motion to intervene in Fou v. Fou action for the purpose to set aside the opinion rendered by Judge Barry A. Weisberg dated September 12, 2012, which was the product of fraud upon the court and unconstitutional without giving plaintiff Tung an opportunity to defend himself before the decision was rendered. (Exhibit "16")

89.    On or about January 3, 2019, Judge Paley rendered an opinion to grant legal fees to Mrs. Fou's attorneys in the amount of $650,000 after James Plaisted, Esq. made an application for attorney's fees, costs and expenses in Fou v. Tung malpractice action for more than $1.5 Million Dollars for legal fees for his representation in the malpractice action against Mr. Tung, even though the trial court Judge Paley had dismissed the claims against Mr. Tung for punitive damages. (Exhibit "17")

90.    On or about January 11, 2019, James Plaisted, Esq. submitted a proposed final judgment for a total of $1,547,063.31. (Ex hibit "18")

## FIRST CLAIM FOR RELIEF
### (Substantive and Procedural Due Process)

91.    Plaintiff realleges and incorporates by reference, as though fully set forth, paragraph 1 through 90 of this Complaint.

92.    Superior Court of New Jersey is a State Court of general jurisdiction in the State of New Jersey and plaintiff routinely practices law in the said State Court and plaintiff is an officer of the said Court.

93.    The Superior Court publishes a Mission Statement, to wit, "We are an independent branch of government constitutionally entrusted with the fair and just resolution of disputes in

order to preserve the rule of law and <u>to protect the rights and liberties guaranteed by the</u> <u>Constitution and laws of the United States and this State.</u>"  By failure to implement in its administrative code with pertinent provisions to prevent its officers of the court from being maliciously prosecuted by fraud upon the court, especially in the situations where the officers of the court are not a party to the action and are not given an opportunity to defend themselves in the court proceedings,  the administrators for justice in the Superior Court of New Jersey breached their pledge when they took the oath to be charged to uphold the Constitution and laws of the United States and the laws of the State of New Jersey.

94.    In *Ex parte Garland*, 71 U.S. (4 Wall.) 333 (1866), the Supreme Court of the United States ruled that counselors are officers of court.  Officers of court have legal and ethical obligations.  They are tasked to participate to the best of their ability in the functioning of the judicial system as a whole, in order to forge justice out of the application of the law and simultaneous pursuit of the legitimate interests of all parties and the general good of society.  As officers of the court, lawyers have an absolute ethical duty to tell judges the truth, including avoiding dishonesty or evasion about reasons the attorney or his/her client is not appearing, the location of documents and other matters related to conduct of the courts. Therefore, if an officer of court is accused of being dishonesty with the court during his performance of his duty in the court proceeding by the court, the officer of court must be given pertinent substantive and procedural due process procedures to defend himself before the court, which had accused the officer of court of misconduct, renders any decisions or opinions against the officer of the court.

95.    Pursuant to the Fourteenth Amendment to the Constitution of the United States and there has been full recognition of the due process right granted to plaintiff or attorneys similarly situated who are licensed to practice laws in the State of New Jersey by the ruling in the United

States Court of Appeals for the Third Circuit in *Bowers v. NCAA*, 475 F.3d 524, 2007 U.S. App. LEXIS 2150 (The judicial criticism against an attorney in an opinion or order rising to the level of a public reprimand is a sanction, thereby due process must be given before rendering such an opinion),the Superior Court of New Jersey should have implemented in its administrative code with pertinent provisions or mechanisms to prevent its officers of the court from being maliciously prosecuted by fraud upon the court, especially in the situation where the officers of the court are not a party to the action and are not given an opportunity to defend themselves in the court proceeding.

96.     Failure to implement pertinent substantive and procedural due process procedures to safe guard the officers of the court, such as, the Plaintiff or attorneys similarly situated, from being maliciously prosecuted by fraud upon the court in court proceedings, where Plaintiff or attorneys similarly situated are not a party and is not given an opportunity to defend themselves, has caused harms to Plaintiff and will cause harms to attorneys similarly situated in the future. Plaintiff or attorneys similarly situated will not able to obtain a full, fair, and impartial trial when the judges in the subsequent malpractice proceedings or other court proceedings rely on and use the decisions and opinions against Plaintiff rendered in the prior proceedings where Plaintiff or attorney similarly situated was not even a party and was never given an opportunity to defend themselves.

97.     The decision and opinion of the Appellate Division of the Superior Court of New Jersey dated July 21, 2016 and the decision and opinion of Judge Barry A. Weisberg of the Superior Court New Jersey dated September 12, 2012 in the matrimonial action Fou v. Fou and all subsequent court's related decisions and judgments had caused Plaintiff harm and injury in that the Plaintiff's law firm KEVIN KERVENG TUNG, P.C. has filed for bankruptcy protection to

avoid the enforcement of the judgment of the Superior Court of New Jersey against the Plaintiff and his law firm. Plaintiff's liberty interests have been damaged in that the reputation of the Plaintiff has been tarnished severely in the community that Plaintiff practices laws by the unconstitutional decisions or opinions of the Courts.

98.     The Plaintiff has sustained injuries in the subsequent malpractice action or other court proceedings against Plaintiff. The attorneys similarly situated will sustain similar injuries in the future, if the Judges who manages and supervises the court administrative systems in the Superior Court of New Jersey is not enjoined to implement pertinent substantive and procedural due process procedures to safe guard the officers of the court.

99.     In *Bowers v. NCAA*, 475 F.3d 524, 2007 U.S. App. LEXIS 2150, the United States Court of Appeals for the Third Circuit reversed an order entered by the District Court, which granted the motion for sanctions against the plaintiff and plaintiff's counsel on the ground that the District Court violated the procedural due process right of attorneys for the plaintiff. The Third Circuit quoted that "[w]henever the district court imposes sanctions on an attorney, it must at a minimum, afford the attorney notice and opportunity to be heard." *Weissman*, 179 F.3d at 1198 (finding that the district court violated attorney's due process rights by failing to give him notice and an opportunity to be heard prior to sanctioning him); *see also In re Ruffalo,* 390 U.S.544, 550, 88 S. Ct. 1222, 20 L.Ed.2d 117 (1968) (stating that attorneys subject to disciplinary proceedings are entitled to procedural due process protections, including fair notice of charges). In *Bowers*, the District Court's opinion and order was filed, the attorneys for the Bowers had no idea that the Court was even considering levying sanctions against them. The Third Circuit found that under these facts, the District Court violated these attorneys' rights to procedural due process.

100.   <u>The novel issue in in *Bowers v. NCAA* was that the Third Circuit must first determine whether attorneys for the Bowers have standing to appeal the sanctions order, because the sanction order did not impose any monetary or disciplinary sanctions on the Bowers' attorneys beyond factual findings and language in the actual order that the conduct of those attorneys merited sanctions.</u>  This is a similar situation here in Judge Weisberg's opinion and the decision of the Appellate Division that consist of a finding of facts on Plaintiff Tung's unethical representation in Mrs. Fou's uncontested matrimonial action but no monetary was imposed.  The Bowers' Court rejected the argument that the attorneys suffered no cognizable injury to establish Article III standing.  See, *Bowers v. NCAA*, 475 F.3d 524, 543, 2007 U.S. App. LEXIS 2150.

101.   The Third Circuit found that the Courts of Appeals as to whether and when a court's statement in a judicial opinion amounts to a sanction "affecting an attorney's professional reputation" and thus "imposing a legally sufficient injury to support appellate jurisdiction."  Most courts agree that mere judicial criticism is insufficient to constitute a sanction.  In addition, courts are in near complete agreement that an order rising to the level of a public reprimand is a sanction. See, *Bowers v. NCAA*, 475 F.3d 524, 543.

102.   The Third Circuit cited several cases to illustrate the situation where an opinion rising to the level of a public reprimand is a sanction.  See, *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988) (noting ability to issue a formal reprimand of attorney for violating Federal Rule of Criminal Procedure), *Talao*, 222 F.3d at 1138 (equating formal finding with public reprimand and sanction), *Williams*, at 156 F.3d at 91, 92 ("Words alone may suffice [as sanction] if they are expressly identified as a reprimand."), *Walker v. City of Mesquite, Tx.*, 129 F.3d 831, 832 (5th Cir. 1997)  (finding appealable sanction where attorneys were "reprimanded sternly and found guilty of blatant misconduct"), *United States v.*

*Horn*, 29 F.3d 754, 758 n.1 (1st Cir. 1994), see also Fed. R. Civ. P. 11(c)(2) (providing, inter alia, that sanctions may consist of "directives of a nonmonetary nature").  "The reason for the courts' consensus is that a public reprimand carries with it the formal censure of the court and may, in many cases, have more of an adverse effect upon an attorney than a minimal monetary sanction. *See, e.g., Precision Specialty Metals, Inc. v. United States*, 315 F.3d 1346, 1355 (Fed. Cir. 2003)." See, *Bowers v. NCAA*, 475 F.3d 524, 543.

103.    In the instant case, Judge Weisberg's opinion and the Appellate Division's opinion that consist of a finding of facts on Mr. Tung's unethical representation in Mrs. Fou's uncontested matrimonial action rises to a level of a public reprimand.  On page 65, lines 11-25 and page 66, lines 1-4, Judge Weisberg did a factual finding that Mr. Tung was representing both parties.  On page 67, lines 23-25, page 68, lines 1-6, lines 15-17, page 69, lines 6-9, page 70, lines 13-17, lines 24-25, page 71, lines 1-18, Judge Weisberg did a factual finding that Mrs. Fou was manipulated through this divorce process.  "The English agreement (prepared by Mr. Tung), quite frankly in the way it was presented to the Court, unfortunately rises to the level of a fraud upon the Court." (See, page 71, lines 4-7)  "Certainly no judge reading that agreement would have any way of knowing that the separate Chinese agreement exist.  At the very least, it was a knowing concealment of a relevant fact (by Mr. Tung)."  (Judge Weisberg was advised or misrepresented by Mrs. Fou's attorney with false facts that "Chinese agreements are executed the very day.  They go to Mr. Tong and they contained these promises that she understood were binding.  And he (Mr. Tung) then controls the proceedings."  (See, page 61, lines 2-7)  (Exhibit "2")

104.    When Judge Weisberg made those findings of facts in the absence of Mr. Tung's participation of the hearing in making the determination of the Mrs. Fou's motion to set aside the Property Settlement Agreement except Mr. Tung was subpoenaed to testify as a fact witness for

the uncontested divorce proceeding, Mr. Tung's due process right was violated.  Mr. Tung could not ask himself questions or cross-examine other witnesses in the hearing, he was not allowed to sit in the entire hearing to listen to other witnesses' testimonies and to raise his objections, because Mr. Tung was a fact witness. In fact, the issue had been decided by at least one court that being called as a witness was not an equivalent of being represented adequately in a proceeding to defend oneself.  See, *Stevens v. Horton*, 984 P.2d 868, 161 Or.App. 454 (1998).

105.    If plaintiff Tung was afforded a full opportunity to present his defense and full opportunity to be heard in the hearing, the fraud upon the court by the attorneys for Mrs. Fou could have been prevented or identified during the hearing.  The instant case is not just a fraud upon the court by some fraudulent instrument or perjured evidence.  The instant case is the legal doctrine set forth in *United States v. Throckmorton*, 98 U.S. 61, 25 L.Ed. 93, 95, 1878 U.S.LEXIS 1362, the relief should been granted on the ground that  "some fraud practiced directly upon the party seeking relief against the judgement or decree, that party has been prevented from presenting all of his case to the court."  See, *United States v. Throckmorton*, 98 U.S. 61, 25 L.Ed. 93, 95, 1878 U.S.LEXIS 1362. This legal principal or doctrine was set forth in place over one hundred years.

106.    Likewise, the opinion of the Appellate Division also made findings in various part of the opinion against Mr. Tung. ("Exhibit "1"") Mr. Tung was not a party in the proceeding and was never afforded an opportunity to defend himself against those findings during the appellate proceeding.  Plaintiff Tung was not afforded an opportunity to file brief on his behalf opposing the allegations against plaintiff Tung.   Needless to say, the opinions of Judge Weisberg dated September 12, 2012 and Appellate Division were not a mere judicial criticism, which is insufficient to constitute a sanction, but an opinion rising to the level of a public reprimand as a sanction.

107.    In addition, Judge Weisberg's opinion actually has more of an adverse effect upon Mr. Tung in all subsequent court proceedings against Mr. Tung.  The attorneys for Mrs. Fou used Judge Weisberg's decision, which was the product of fraud upon the court, in all subsequent court proceedings to defeat plaintiff Tung's motion for summary judgment (See page 13, lines 3-18, Exhibit "13") and the attorneys for Mrs. Fou introduced Judge Weisberg's decision in the malpractice trial as if, so to speak, they were using the fruit of the poisonous tree to prove the malpractice case.  The best examples are that the Appellate Division heavily relied on the trial court's finding and decision by Judge Weisberg.  See Exhibit "1" and that trial court judge Paley in Janet For v. Kevin Tung even waved opinions of the courts to the Jury and specifically told them that Judge Weisberg's decision set aside the Property Settlement Agreement prepared by Mr. Tung.  Said decision was affirmed by the Appellate Division.  The Clerk of the Appellate Division even referred Mr. Tung to Office of Attorney Ethics of the Supreme Court of New Jersey for investigation.

108.    Therefore, when Judge Weisberg rendered his opinion or decision by imposing sanctions against Mr. Tung, an attorney, and declaring the retainer agreement invalid, where Mr. Tung was the party to the retainer agreement, the court must at a minimum, afford Mr. Tung notice and opportunity to be heard of any defense that Mr. Tung may have before rendering such an opinion or decision.  By failure to give any advance notice to Mr. Tung and afford an opportunity for Mr. Tung to prepare for his defense before rendering such an opinion or decision, Judge Weisberg's decision or opinion is in violation of the attorney's procedural due process right guaranteed by our Constitution.  As a matter of law, Judge Weisberg's decision or opinion shall be set aside or modified.  Likewise, as matter of law, the opinion of the Appellate Division rendered in the absence of Mr. Tung's participation shall be set aside or modified.

109.    For the foregoing reasons, this Court shall declare (1) that the decision and opinion of the Appellate Division of the Superior Court of New Jersey dated July 21, 2016 and the decision and opinion of Judge Barry A. Weisberg of the Superior Court New Jersey dated September 12, 2012 in the matrimonial action Fou v. Fou violated plaintiff Tung's rights to substantial and procedural due process under the Fourteenth Amendment to the Constitution of the United States and the full recognition of the due process right granted by the ruling in the United States Court of Appeals for the Third Circuit in *Bowers v. NCAA*, 475 F.3d 524, 2007 U.S. App. LEXIS 2150 (The judicial criticism against an attorney in an opinion or order rising to the level of a public reprimand is a sanction, thereby due process must be given before rendering such an opinion), (2) that Chief Justice of the Supreme Court of New Jersey shall be enjoined to implement pertinent substantive and procedural due process procedures to safe guard the officers of the court, such as, the plaintiff, Kevin K. Tung, Esq. or attorneys similarly situated, from being maliciously prosecuted by fraud upon the court in court proceedings, where plaintiff or attorneys similarly situated is not a party and is not given an opportunity to defend themselves, (3) the Presiding Administrative Judge of the Superior Court of New Jersey shall be enjoined to take corrective measures and remedies to ensure plaintiff's substantive and procedural due process rights and liberty rights are not continuingly violated by removing the unconstitutional decisions or opinions from the public domain so that plaintiff will not continue to suffer the continuing wrong generated from those two unconstitutional decisions or opinions.

110.    Plaintiff has no adequate remedy at law.

**WHEREFORE**, plaintiff prays for declaratory relief as follows:

1.    That this Court declare that that the decision and opinion of the Appellate Division of the Superior Court of New Jersey dated July 21, 2016 and the decision and opinion of Judge

Barry A. Weisberg of the Superior Court New Jersey dated September 12, 2012 in the matrimonial action Fou v. Fou violated plaintiff Tung's rights to substantial and procedural due process under the Fourteenth Amendment to the Constitution of the United States and the full recognition of the due process right granted by the ruling in the United States Court of Appeals for the Third Circuit in *Bowers v. NCAA*, 475 F.3d 524, 2007 U.S. App. LEXIS 2150 (The judicial criticism against an attorney in an opinion or order rising to the level of a public reprimand is a sanction, thereby due process must be given before rendering such an opinion), thereby the said decisions are unconstitutional in that those decisions denied the Plaintiff's rights to due process in contravention of the Fourteenth Amendment to the United States Constitution.

2.    That Issuing a preliminary and a permanent injunction that enjoins the Defendant Stuart Rabner, the Chief Justice of the Supreme Court of New Jersey, who also serves as the administrative head for the court system, overseeing the management of the New Jersey State courts systems, to implement pertinent substantive and procedural due process procedures to safe guard the officers of the court, such as, the plaintiff, Kevin K. Tung, Esq. or attorneys similarly situated, from being maliciously prosecuted by fraud upon the court in court proceedings, where plaintiff or attorneys similarly situated is not a party and is not given an opportunity to defend themselves in the future.

3.    That Issuing a preliminary and a permanent injunction that enjoins the Defendant Glenn A. Grant, the Acting Administrative Director of the New Jersey Courts, who is appointed by the Chief Justice to help the Chief Justice to fulfill the management duties of the courts systems for the State of New Jersey pursuant to the New Jersey Constitution of 1947, to implement pertinent substantive and procedural due process procedures to safe guard the officers of the court, such as, the plaintiff, Kevin K. Tung, Esq. or attorneys similarly situated, from being maliciously

41

prosecuted by fraud upon the court in court proceedings, where plaintiff or attorneys similarly situated is not a party and is not given an opportunity to defend themselves in the future.

4.     That Issuing a preliminary and a permanent injunction that enjoins the Defendant Carmen Messano, the Presiding Judge for Administration for the Appellate Division of the Superior Court of New Jersey, who is responsible for the overall administration of the Appellate Division of the Superior Court of New Jersey, to take corrective measures and remedies to ensure plaintiff's substantive and procedural due process rights are not continuously violated by removing the unconstitutional decisions or opinions from the public domain so that plaintiff will not continue to suffer the continuing wrong generated from those two unconstitutional decisions or opinions.

5.     Plaintiff Tung be awarded reasonable attorney fees and costs; and

6.     Plaintiff Tung have such other and further relief as the Court may deem just and proper.

Dated: Queens, New York
        December 23, 2019

Kevin K. Tung, Esq., Pro Se